# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAD LEE YOUNG, ) | 1:09-cv-01891 JMD (HC) |
| ) | |
| Petitioner, ) | ORDER DENYING PETITION FOR WRIT |
| ) | OF HABEAS CORPUS |
| v. ) | |
| ) | ORDER DECLINING TO ISSUE |
| BEN CURRY ) | CERTIFICATE OF APPEALABILITY |
| Respondent. ) | |
| ) | ORDER DIRECTING CLERK OF COURT |
| ) | TO ENTER JUDGMENT |
| _____ ) | |

Thad Lee Young ("Petitioner") is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Both parties consented, pursuant to Title 18 U.S.C. § 636(c)(1), to have a magistrate judge conduct all further proceedings, including entry of final judgment. The case was reassigned to the undersigned on June 1, 2010.

## PROCEDURAL BACKGROUND

On March 27, 2007, a jury found Petitioner guilty of six counts of committing lewd acts upon a child (Cal Pen. Code § 288(a)[1]), two counts of child molestation (§ 647.6(a)), and one count of misdemeanor possession or control of child pornography (§ 311.11(a)). The jury found true the special allegation that the victim was under fourteen years of age and that Petitioner had substantial sexual conduct with the victim. (§ 1203.066(a)(8).) Petitioner was sentenced to sixteen years in prison. (See Lod. Doc. 4, Opinion of the California Court of Appeal, Fifth Appellate District (hereinafter "Opinion"), at 2, Jan. 12, 2009.)

---

[1] All further statutory references are to the California Penal Code unless otherwise stated.

1    On October 22, 2007, Petitioner appealed to the California Court of Appeal, Fifth Appellate

2 District, which denied his appeal in a reasoned decision on January 12, 2009.

3    Petitioner filed a petition for review with the California Supreme Court, which was

4 summarily denied on April 16, 2009.

5    Petitioner filed the instant petition for writ of habeas corpus with this Court on October 28,

6 2009.  Respondent filed an answer to the petition on January 27, 2010.

7                              **FACTUAL BACKGROUND**[2]

8    **Prosecution Case**

9    Dena F., the victim's mother, testified that she met Young at a friend's house
in Visalia, California, in 1998, and they started dating around that time. After dating
Young for approximately one year, Dena and her two daughters, C.L. and K.L.,
10   moved into Young's apartment in Visalia. Dena's daughters were two and four years
old respectively when they lived at Young's apartment. Dena's brother, Billy, stayed
11   with them for a month when they lived at the apartment.

12   During this time, Dena was going to school and working part time. Dena's
friend Jackie watched the children when she was not home. Young watched the
children if Dena needed to go to the store. K.L. and Young had a good relationship;
13   he was like a father to her. This relationship changed when they moved into a house
in Farmersville that was owned by Young's brother.

14   They lived in the Farmersville house from about 2001 to 2003. During this
time, Dena's daughters were approximately five and seven years old. Dena worked
15   full time until she went back to school during the last year they lived in the
Farmersville house. Instead of paying for a babysitter, Young and Dena agreed that
16   she would work the night shift so that she could be home during the day to get the
children to school or to pick them up. No one else lived with them at the Farmersville
17   house, except for Dena's ex-sister-in-law whom, Young kicked out after two days.

18   When they first moved into the Farmersville house, Dena testified that they
only had one computer, but there were approximately half a dozen computers in the
19   house by the time she moved out. Dena used the computers on a few occasions, but
Young was the primary user. When Dena first got her computer, Young was on it all
20   of the time. Dena had access to the computer during the day when Young was at
work, and she downloaded e-books and scanned pictures of her children into the
21   computer. At some point, she found pornographic pictures on the computer and asked
Young not to put them on her computer.

22   On another occasion, Dena came across child pornography when she clicked
on a website in a "Hotmail community." She told Young about it and they shut it off.
23   Sometime later, Dena saw Young downloading those pictures and she believed him
when he told her that he was going to turn them in to AOL. There were also times
when Dena was on the computer and pictures of regular pornography or bestiality
24   would pop up. This concerned Dena and she asked Young not to have these things on
her computer.

25   Dena admitted to looking at bestiality images on the computer with Young,
but denied ever looking at child pornography. According to Dena, Young kept all of

26

27   _____
    [2]The facts are derived from the factual summary set forth by the California Court of Appeal, Fifth Appellate District,
28   in its opinion of January 12, 2009, and are presumed correct pursuant to 28 U.S.C. §§ 2254(d)(2), (e)(1).  (See Opinion, 2-
    12.)

his pornographic movies on the top shelf of the closet in the computer room. As far as she knew, those movies contained only adult pornography.

K.L. testified that when they lived in the Visalia apartment, Young told her that she had to touch his penis in order to get a coloring book. At the Farmersville house, Young looked at "porn" on the computer and on television. On one occasion, Young showed K.L. a pornographic picture of himself with a girl whom Young said was the same age as K.L. at that time, which was seven years old. There were other times when Young looked at pornography when he knew that K.L. was in the room.

One night, when K.L.'s mother was at work, Young asked K.L. to touch his penis. K.L.'s young sister, C.L., was asleep in the bed when this happened. K.L. touched Young's penis with her hand underneath his clothes. Young did not do or say anything to K.L. when she did this. She stopped when Young told her to go back to bed because her mother was about to come home from work.

On more than one occasion, Young told K.L. to orally copulate him while they were in the computer room in the Farmersville house. Young also touched K.L.'s vagina, underneath her clothes, with his finger. K.L.'s mother was at work when this abuse occurred.

Young also took showers with K.L. while both were nude. While they were in the shower, Young told K.L. to get down on her hands and knees and he put his penis between her legs, but did not penetrate her vagina. When K.L. and Young took showers together, her mother and sister were both asleep. K.L. never saw Young taking showers with C.L.

On another occasion, when K.L. was in the living room., Young told her to take off her clothes and get on her hands and knees. K.L. complied and Young held the family dog behind K.L. and tried to put the dog's penis into her vagina. Sometime before this incident, K.L. saw Young holding the dog on his lap and rubbing the dog in the area around the penis.

The first person K.L. told about any of these incidents was her grandmother, Nancy B. Nancy testified that K.L. and C.L. occasionally spent the night at her house. June 15, 2003 was one such night. When Nancy was putting the girls to bed that night, K.L. asked Nancy where babies came from and how they were made. Nancy just laughed and told K.L. that she needed to talk to her mother about that.

According to Nancy, K.L. then asked her what the "white stuff" was that came out of a man's penis. K.L. told her that Young had told K.L. that the "white stuff" was sperm. K.L. went on to tell Nancy that Young had made K.L. put his penis in her mouth. According to Nancy, K.L. also told her that Young showed K.L. pictures of a dog and little girls, and Young tried to get K.L. to "do it" with the family dog.

The next morning, Nancy told Dena about these allegations and Dena contacted the police. Nancy testified that she knew there was pornography in the Visalia apartment, and she told Dena that it was inappropriate and if she saw it again, she would do something about it. Nancy also testified that she always had a feeling something had been going on since K.L. was three years old, but she could not prove it.

At the time that Dena learned about these allegations, she had recently broken up with Young, and she and her daughters were no longer living with him. They had moved in with her mother about a month before K.L. reported the molestation because Young refused to support Dena and the kids so that Dena could go to school full time and only work part time. However, she did stay at his house on the weekend because she worked 12-hour shifts and his house was only 10 minutes from her work. No one else was living with Young at the time K.L. made the allegations against him.

Even though Dena and Young had recently broken up, she still had feelings for him and they were still somewhat romantically involved. Dena continued to talk to Young for three months after K.L. made her allegations, but they did not have a sexual relationship during this time. Dena put K.L. in therapy after she reported the molestation.

### A. The Investigation

In June of 2003, Jess Gutierrez, a sexual assault investigator with the Tulare County Sheriff's Department, began investigating the allegations of sexual molestation made by K.L. against Young. K.L. told Detective Gutierrez that the most recent incidence of molestation occurred approximately two weeks prior, and there had never been vaginal or anal penetration. Based upon the information provided by K.L., Detective Gutierrez did not feel the need to put K .L. through the extremely invasive Sexual Assault Response Team (SART) examination of the anus or vagina, which is usually ordered when the sexual assault is alleged to have occurred within 72 hours prior to the report.

### B. KL's Videotaped Interview

Detective Gutierrez also was present when K.L. was interviewed by CART (Child Abuse Response Team) on June 16, 2003. A videotape of this interview was played for the jury. In the interview, K.L. said she used to live with Young, but they moved out one or two months ago or maybe two or three weeks ago. She said she was not allowed to see him anymore because he made her suck on his "weenie." This happened when K.L. was eight years old and her mother was working the night shift.

K.L. said that she and Young started taking showers together when she was eight years old. She said nothing happened in the shower; they would just wash their hair and bodies and get out. Young did not touch her when they were in the shower together. The first time he made her suck his weenie was in the computer room in the Farmersville house. At the time, C.L. was asleep and her mother was at work. Young was on the computer and he showed K.L. a picture of him putting his weenie in a seven-year-old girl's vagina. When she sucked on his weenie, it was hanging down and soft. She did not see anything come out of his weenie.

K.L. said Young made her suck his weenie in his bedroom and in the living room. Her mother was always at work when this happened. The last time it happened was about one or two days before she went to live with her grandmother. Young never said anything to K.L. when she sucked on his weenie, but he groaned.

Young rubbed the outside of K.L.'s vagina with his finger one time when they were in the living room. Then Young made K.L. get on the floor on her hands and knees, and had her take her underwear off. That is when he tried to put the dog's weenie into K.L.'s vagina but it did not work. When they lived in an apartment, Young told K.L. that he would give her a coloring book if she touched his weenie, but she did not touch it.

When they took showers together appellant put his weenie between her legs close to her vagina, and he told her to hold his weenie while he moved up and down. His weenie was hard when he did this and white stuff came out into her hand. K.L. said Young told her not to tell her mother because he did not want either of them to get in trouble. No one else had ever touched her in the manner that Young did.

### C. The Search

On June 18, 2003, Detective Gutierrez served a search warrant on Young's residence in Farmersville. During the search, Detective Gutierrez found a videotape labeled "Ms. Piggy XXXX" in the computer room. Detective Gutierrez viewed this tape, which contained young adult females engaging in sexual acts with animals. Officers also located approximately six computers in the house and numerous compact and floppy discs.

Detective Christopher Porter from the Tulare County Sheriff's Department was responsible for securing the digital evidence recovered during the search. During the search of the home, the officers found in one room two computers on desks, several other computers around the room, and compact and floppy discs on the desk and on the floor. Detective Porter ran a forensic analysis on the computers and found files containing links to child pornography and bestiality websites.

Detective Porter found several documents on one of the compact discs that linked the disc to appellant. One such document appeared to be a scanned check from

the State of California, and another was a scanned Department of Motor Vehicles record in Young's name. Detective Porter estimated that he recovered 500 bestiality files, movies, and pictures from the computers and discs found in Young's residence.

He also recovered files from both compact and floppy discs containing child pornography. Detective Porter ran these pictures though the National Center for Missing and Exploited Children's database, but did not get any matches. However, one of the pictures did match a picture from the United States Department of Justice that was suspected child pornography.

Police recovered a total of 62 compact discs and 176 floppy discs in Young's residence. Based on all of the computer-related evidence found in Young's residence, Detective Porter considered Young to be technically savvy.

**Defense Case**

Young testified that he and Dena were involved in a romantic relationship for five to six years. When he started dating Dena, he was a long haul truck driver, and Dena spent approximately three months on the road with him. Dena's mother, Nancy, and Young's cousin, Jeanette Clark, watched the children during this time. At some point during this trip, Dena allegedly told Young that she wanted to give her mother custody of the children so she could stay with him on the road. Young said he arranged for her to get home immediately and refused to allow her to give up custody of the children because "her kids were more important than any man would be."

After about a year, Young changed his schedule so that he would not be driving cross country anymore, and that is when they moved into the Farmersville house. They lived in the Farmersville house for about a year before Dena went back to school. When Dena was at school, either Young or Nancy would watch the children. Sometimes Nancy would watch them at Young's house, and other times she would watch them at her house. Young believed the children preferred living at Nancy's house because discipline was lax when they were at Nancy's house.

Young said he had a lot of computers in his house because he replaced small parts on his friends' computer for free. Sometimes his friends would leave compact discs in the computers when they brought them to his house. He said he usually put these discs in a box that contained hundreds of other discs. Young testified that sometimes he took his computers to a man named Mr. Manfredie, who performed work on the computers that Young did not know how to do. He left the computers with Manfredie for weeks at a time. He claimed that Manfredie gave him boxes of discs and most of the computer-related items he had.

Young testified that the main reason he stopped taking computers to Manfredie was because Manfredie was charged with possessing child pornography. However, the prosecutor pointed out that Manfredie was not arrested on the child pornography charges until 2006, and that the charges involved boys and not girls.

When Young received images of bestiality through an email or in a popup, he claimed that he showed them to Dena and they got rid of them. Young admitted to saving legal pornography onto compact discs. Young said Dena received child pornography through emails on a couple of occasions, which she brought to Young's attention. He claimed that they reported the pictures to AOL, but never received a response. Young said that most of the pictures of him nude with an erection were taken by Dena, and he denied taking any of them himself.

Young testified that they had a satellite system for the television with access to adult channels. The children were not allowed to touch the television or the computers. Young claimed that he did not touch the satellite because it was Dena's system. Young remembered two occasions where he caught the children watching adult channels on television, and he told Dena about it. As far as he knew, Dena never did anything to block the adult channels so the children would not be able to view them.

Young denied getting in the shower with K.L. or helping her take a shower. He claimed he merely told her that she could take a shower before she went to sleep.

He denied ever placing his hands on K.L.'s vagina area purposefully or accidentally. He claimed he never told K.L. to touch his penis or to orally copulate him. He also denied trying to force K.L. to have sex with the family dog, and he questioned whether it could even be possible because the dog was "blind and deaf." He also said he did not commonly use the term "sperm," and he never used that term in front of K.L., C.L., or Dena.

Young admitted that K.L. and her younger sister C.L. saw him nude when they walked in on him and Dena engaged in sexual intercourse and oral sex on numerous occasions. He also admitted to spanking K.L. on the butt when she was naughty and refused to do something he told her to do. Dena never spanked K.L., but he claimed that she did not get mad at him when he spanked K.L.

Young claimed that even after K.L. made the molestation allegations against him, he and Dena continued to have sexual relations until the weekend he was taken into custody, which was six months later. During this time, Dena would stay at Young's house on the weekends and they talked on the phone several times a day. Young claimed Dena told him that K.L. made false allegations of molestation against Dena's brother, Billy.

According to Young, Dena told him that she did not believe the accusations and she thought her mother, Nancy, was trying to get him out of her life. Young and Nancy were not friends, and Nancy always commented on his laziness. Dena and Nancy both had relaxed parenting styles, and Young was the only one who disciplined the children. Young believed that K.L. made these molestation accusations against him because she did not like it when he disciplined her, and she did not want to be around him.

Young admitted to having a sexual relationship with Dena's good friend, Crystal, which started toward the end of his relationship with Dena. He said that when Dena found out that he was cheating on her with her good friend, she became extremely upset. As far as he knew, Dena and Crystal were no longer good friends. After he was released from jail, Young claimed Dena went to his house and flipped him off and cursed him. Young believed that Dena did this because he cheated on her based upon what she said to him, and not because he molested her daughter or exposed her daughter to pornography.

Shelly McGahey was Young's and Dena's friend and neighbor. McGahey testified that Dena told her that K.L. had made molestation allegations against her brother Billy once before, and when Dena confronted K.L. about them, K.L. said it never happened. McGahey never spoke directly with K.L. about the allegations against Billy. She had no personal knowledge as to whether K.L. ever made those allegations or, if they were made, whether they were true or false.

Detective Gutierrez talked to McGahey during the course of his investigation, and she told him that Dena told her about a past molestation allegation by K.L. of Billy. When Detective Gutierrez asked Dena about the alleged past molestation, she denied it and said that there had never been any such allegations by K.L. against Billy. Detective Gutierrez never talked to Billy during the course of his investigation because he was unable to find him. Dena told Detective Gutierrez that the allegation against Billy had nothing to do with any of her children, and that it involved one of Billy's children. On cross-examination, Detective Gutierrez testified that Dena said that Billy and his wife were going through a divorce and fighting over custody of the children. The allegations of molestation involving Billy's child stemmed from these events, and it was never reported to law enforcement.

C.L. testified that when she lived with Young, she shared a room with K.L., and sometimes they stayed up late talking. C.L. said she and K.L. saw naked adults on television when their mother and Young were watching television. When this happened, they told the girls to cover their eyes. C.L. testified that once she, her sister, and her cousin walked by the computer and they saw a picture of an adult man and a girl having sex. She said that K.L. never told her that she saw adults kissing children

on the computer. K.L. also said that Young never touched her inappropriately. C.L. testified that Young never touched her inappropriately.

Detective Gutierrez testified that he was present at the CART interview with C.L. and he observed C.L. during that interview. C.L .'s testimony in court was basically the same as what she said during the CART interview, specifically that Young never touched her inappropriately. However, Detective Gutierrez testified that during the CART interview, C.L. said K.L. told her that K.L. had seen adults kissing children on the computer.

Jeannette Clark, Young's cousin, testified that she was a live-in babysitter for K.L. when K.L. was between the ages of two-and-a-half and four. Clark stated that she lived with K.L. when the family was at two different Visalia apartments, and when they were at Nancy's house. Clark observed K.L.'s behavior on a daily basis and she saw K.L. manipulate situations in order to get what she wanted. On cross-examination, Clark testified that she did not tell the police about K.L.'s manipulative behavior when she learned about the allegations against her cousin because it happened so long ago, she did not think it was relevant.

## DISCUSSION

### I. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The deprivation in question arose out of the Tulare County Superior Court, thus, the Court has jurisdiction over the action and venue is appropriate.  18 U.S.C. § 84(b).

### II.  Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997)) (holding AEDPA only applicable to cases filed after statute's enactment); See also Bobby v. Van Hook, __ U.S. __, 130 S.Ct. 13, 16 (2009); Pinholster v. Ayers, 509 F.3d 651, 662 (9th Cir. 2009).

The instant petition is reviewed under the provisions of AEDPA.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an

1   unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

2   the United States" or "resulted in a decision that was based on an unreasonable determination of the

3   facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); see

4   Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413 (contrary to or an unreasonable

5   application of clearly established federal law); Wood v. Allen, __ U.S. __, 130 S.Ct. 841, 849 (2010)

6   (unreasonable determination of fact).

7       As a threshold matter, this Court must "first decide what constitutes 'clearly established

8   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. 63, 71

9   (2003) (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law,"

10  this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

11  of the time of the relevant state-court decision."  Id. (quoting Williams, 592 U.S. at 412.  "In other

12  words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

13  principles set forth by the Supreme Court at the time the state court renders its decision."  Id.

14      Finally, this Court must consider whether the state court's decision was "contrary to, or

15  involved an unreasonable application of, clearly established Federal law."  Lockyer, 538 U.S. at 72,

16  (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant

17  the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

18  question of law or if the state court decides a case differently than [the] Court has on a set of

19  materially indistinguishable facts."  Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.

20  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state

21  court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

22  applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.

23      Thus, the initial step in applying AEDPA's standards is to "identify the state court decision

24  that is appropriate for our review."  Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).  Where

25  more than one state court has adjudicated Petitioner's claims, a federal habeas court analyzes the last

26  reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) for the presumption

27  that later unexplained orders, upholding a judgment or rejecting the same claim, rests upon the same

28  ground as the prior order).  The Ninth Circuit has further stated that where it is undisputed that

federal review is not barred by a state procedural ruling, "the question of which state court decision last 'explained' the reasons for judgement is therefore relevant only for purposes of determining whether the state court decision was 'contrary to' or an 'unreasonable application of' clearly established federal law." Bailey v. Rae, 339 F.3d 1107, 1112-1113 (9th Cir. 2003). Thus, a federal habeas court looks through ambiguous or unexplained State court decisions to the last reasoned decision in order to determine whether that decision was contrary to or an unreasonable application of clearly established federal law. Id.

Here, the California Court of Appeal and the California Supreme Court adjudicated Petitioner's claims. As the California Supreme Court issued a summary denial of Petitioner's claims, the Court "look[s] through" that court's decisions to the last reasoned decision, namely, that of the California Court of Appeal, Fifth Appellate District. See Ylst, 501 U.S. at 804.

### III.  Review of Petitioner's Claims

The petition for writ of habeas corpus contains two grounds for relief, contending that Petitioner's constitutional rights were violated by: (1) the admission of K.L.'s videotaped statements at trial and (2) the admission of statements made by K.L. as attested to by her grandmother, Nancy.

Ground One

Petitioner claims that his Sixth Amendment right to confront witness against him was violated when the court played K.L.'s videotaped statement at trial.  Petitioner further alleges that the court violated California Evidence Code section 1360 by not holding a hearing regarding the reliability of the videotaped statement before it was played in court.

*Constitutional Claim*

The Sixth Amendment's Confrontation Clause was made applicable to the states through the Due Process Clause of the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403-05 (1965). The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. am. VI.  Out-of-court testimonial statements made by witnesses are barred unless the witness is unavailable to testify at trial and the defendant has had an opportunity to cross-examine the witness. Crawford v. Washington, 541 U.S. 36, 68 (2004).  However, the Confrontation Clause "does not bar admission of a statement so long as the

1   declarant is present at trial to defend or explain it." Id. at 59 n.9. "[W]hen the declarant appears for

2   cross-examination at the trial, the Confrontation Clause places no constraints at all on the use of his prior

3   testimonial statements." Id. (citing California v. Green, 399 U.S. 149, 162 (1970)).

4          In this case Petitioner, claims that K.L.'s out-of-court testimonial statement, namely the

5   videotaped testimony, violates the Confrontation Clause.  The appellate court found that "K.L. was

6   present at trial.  Thus, the Confrontation Clause does not bar the admission of prior statements by K.L."

7   (Opinion, 14.)  The Court finds that the appellate court's analysis is not an unreasonable application of

8   Supreme Court law.  K.L. took the stand at trial and was subject to cross-examination and re-cross by

9   Petitioner's attorney (See RT, 162-175, 178-179) bringing all of her previous testimonial statements

10  squarely within the bounds of the Sixth Amendment.

11          *California Evidence Code Claim*

12          Petitioner argues that the court was required to hold a hearing as to the reliability of K.L.'s

13  videotaped statements before playing them in court, pursuant to California Evidence Code section

14  1360(b).

15          "Federal habeas courts do not review questions of state evidentiary law.  (citation omitted)  Our

16  habeas powers do not allow us to vacate [a] conviction 'based on belief that the trial judge incorrectly

17  interpreted the California Evidence Code in ruling' on the admissibility of evidence." Briceno v.

18  Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991)).

19  Evidence erroneously admitted in a state court "warrants habeas relief only when it results in the denial

20  of a fundamentally fair trial in violation of the right to due process." Briceno, 555 F.3d at 1077 (quoting

21  Estelle, 502 U.S. at 67-68).

22          The appellate court found that the trial court erred by not conducting the evidentiary hearing, but

23  went on to find the error harmless because, on independent review, the appellate court found that the

24  "'time, content, and circumstances of the statement provide sufficient indicia of reliability.'" (Opinion,

25  15 (quoting Cal. Evid. Code § 1360.)) The Court finds that the appellate court's harmless error analysis

26  is not an unreasonable application of federal law.  K.L.'s testimony at trial corroborated her videotaped

27  statement and additionally, she was available for cross-examination regarding her testimony on the stand

28  and her videotaped statement.  As the appellate court's decision was not unreasonable in the face of

1    Supreme Court Law, Petitioner is not entitled to relief on his State evidentiary law claim.

2         Accordingly, Petitioner is not entitled to relief as to Ground One.

3    Ground Two

4         Petitioner claims that the admission of several statements made by K.L. as testified to by her

5    grandmother, Nancy, violates California's "fresh complaint" doctrine.

6         As discussed above, the federal habeas court will not entertain errors of state evidentiary law

7    unless that error results in the denial of a fundamentally fair trial.  The state evidentiary law in question

8    provides that:

9         proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing
          the alleged assault, may be admissible for a limited, nonhearsay purpose–namely, to
10        establish the fact of, and the circumstances surrounding, the victim's disclosure of the
          assault to others–whenever the fact that the disclosure was made and the circumstances
11        under which it was made are relevant to the trier of fact's determination as to whether the
          offense occurred.
12
13   People v. Brown, 8 Cal. 4th 746, 749-50 (1994).  Such evidence must be "narrowly limited to the fact

     of, and the circumstances surrounding, her disclosure of the alleged sexual molestation."  Id. at 750.
14
15        The only analysis that the State appellate court conducted on the issue is as follows: "The People

16   admit that much of the grandmother's testimony was inadmissible under the fresh complaint doctrine.

17   However, the People contend that there was no violation of the Confrontation Clause because K.L.

     testified at trial.  (citation omitted)  We agree."  (Opinion, 18.)  As Petitioner does not assert a
18
19   Confrontation Clause violation in Ground Two of his federal habeas petition and the State court did not

20   conduct an analysis or make a finding as to the "fresh complaint" violation, this Court must make an

21   independent review of the record to decide whether the trial court's admission of the statements made

     by K.L. as testified to by Nancy denied Petitioner his right to a fundamentally fair trial.  Delgado v.
22
23   Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000) ("Federal habeas review is not de novo when the state court

24   does not supply reasoning for its decision, but an independent review of the record is required to

25   determine whether the state court clearly erred in its application of controlling federal law.)  The Court

     finds that, if there was indeed an evidentiary error, it does not rise to the level of a due process violation.
26
27        While the appellate court noted that there was an error of State evidentiary law, the court gave

28   no further discussion as to which of Nancy's statements were admitted erroneously.  However, upon

review of the record, the Court finds that everything to which Nancy testified that could have possibly been admitted in error was also testified to by K.L.  Nancy testified that K.L. told her that Petitioner had made K.L suck on his penis (RT, 199), K.L. also testified that Petitioner made her do this (RT, 151).  Nancy testified that K.L. said that Petitioner put his fingers in her vagina (RT, 203); K.L. similarly testified that Petitioner touched with his hand and put his fingers inside her vagina (RT, 149-50, 152).  Nancy testified that K.L. told her that Petitioner tried to make her have sex with the family dog (RT, 202) and K.L. testified extensively about how Petitioner tried to put the dog's penis into her vagina (RT, 157-60).  Furthermore, during Nancy's testimony the trial judge admonished the jury that "what this witness is testifying is what was told to her by KL, so take it for that.  We just want to know what was told back at that time."  (RT, 203.)

As the trial judge admitted the testimony over the defense's objections (see R.T., 198, 200, 203), the jury was left to weigh the discrepancies between Nancy's and K.L.'s testimony for themselves.  See Gu v. Gonzales, 454 F.3d 1014, 1024 (9th Cir. 2006) (citing U.S. v. Weiner, 578 F.2d 757, 770 (9th Cir. 2006)).  In light of the fact that Nancy's testimony regarding Petitioner's actions were cumulative to K.L.'s testimony, and that the judge specifically told the jury that Nancy's testimony was to be used only to determine the circumstances of K.L.'s disclosure of the molestation, the Court finds that Petitioner was not denied a fundamentally fair trial.  Accordingly, Petitioner cannot be afforded relief as to Ground Two.

## CONCLUSION

For the foregoing reasons, Petitioner is not entitled to relief for either Ground One or Ground Two of this petition.

## CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances.  Miller-El v. Cockrell, 537 U.S. 322, 336-37 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

    (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

    (B) the final order in a proceeding under section 2255.

    (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

    (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If the Court denies a petition, it may issue a certificate of appealability only "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 322 U.S. at 338 (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Id.

In the present case, the Court finds that Petitioner has not made the required showing to obtain a certificate of appealability.

## ORDER

Accordingly, IT IS HEREBY ORDERED that:

1) the petition for a writ of habeas corpus is DENIED;

2) the Clerk of Court is DIRECTED to enter judgment; and

3) certificate of appealability is DENIED.

IT IS SO ORDERED.

Dated:    __June 7, 2010__                __/s/ John M. Dixon__
                                       UNITED STATES MAGISTRATE JUDGE